IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

JORDAN POWELL
6441 Meadowlark Drive
Dunkirk, MD 20754
Anne Arundel County

        Plaintiff,

v.

ALPHABET INC.,
1600 Amphitheatre Parkway,
Mountain View, California 94043

GOOGLE LLC.,
1600 Amphitheatre Parkway,
Mountain View, California 94043

        AND,

YOUTUBE LLC.,
901 Cherry Avenue, Second Floor
San Bruno, CA 94066

        Defendants.

Civil Action No: 19CV1244



COMPLAINT

JURY TRIAL DEMAND

## I. JURISDICTION AND VENUE

1.    Plaintiff's allegations include federal questions involving 15 U.S.C. § 2, 18 U.S.C. § 1343, and 18 U.S.C. § 1512. Plaintiff is a citizen of the State of Maryland whereas Defendant is a citizen of the State of California and the amount in controversy is greater than $75,000. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332.

2. Venue is proper in the United States District Court for the District of Maryland Southern Division because the forum selection clause of Alphabet's subsidiary Google's Subsidiary YouTube's Terms of Service agreement is void because 15 U.S.C. § 22 expressly grants antitrust claims to be brought in any district wherein the accused transacts business or may be found, as the case is here. See, https://events.withgoogle.com/join-google-in-maryland/.

3. Furthermore, Plaintiff is a pro se litigant where electronic filling of Court documents is typically unavailable to pro se litigants such that physical appearance for filings and hearings is most often required. As a result, any other venue besides this Court would create an undue burden upon Plaintiff because Plaintiff is uniquely disadvantaged by the inability to review and submit Court documents remotely, as otherwise allowable if Plaintiff were represented by counsel. Therefore, travel to California for filing of this claim, and for each filing, and for each appearance thereafter, throughout the course of this entire litigation would be unduly burdensome to Plaintiff in particular.

4. In addition, due to the nature of this case, involving fraud as to the historical contents of the very same terms of service and community guidelines in which YouTube's forum selection clause is contained, enforcement of that clause, under these circumstances, would contravene a strong public policy for the achievable pursuit of justice.

## II. FACTS

5. YouTube is a user submitted online video streaming service. In a survey by Statistica.com covering the market share of leading internet video portals, "90% of respondents stated that they use YouTube to watch online video."

6. Junia Arise is a film project presently live on the crowdfunding platform Kickstarter, at the following link: kickstarter.com/projects/junia/junia-arise. Junia Arise is considered a "revolutionary documentary film that unveils a seventeen-century old biblical cover up of female leadership in society," and "represents the [figurative] breaking of the chains for all women, everywhere."

7. Plaintiff is the Director of this film and thereby holds a strong interest in the outcome of the fundraising campaign.

8. During the campaign, Plaintiff created a YouTube account for uploading and sharing the film's trailer on April 8, 2019 at 15:23 EST.

9. Shortly afterwards, Plaintiff shared a link to the Junia Arise trailer on YouTube by posting that link to the Junia Arise Twitter account: @JuniaArise.

10. Plaintiff also searched for videos on YouTube of women in ministry, other faith based content, and film trailers; to invite interested viewers of similiar content to watch the Junia Arise film-trailer on YouTube and learn more about our campaign.

11. Later that same day, YouTube deleted those comments, deleted the Junia Arise film trailer, deleted the Junia Arise YouTube Channel, and Google suspended and/or terminated the Junia Arise account.

12. The YouTube link for this video, youtube.com/watch?v=bN6YVXZsECY, presented a blank screen and a notice that stated: "Video unavailable: This video is no longer available because the YouTube account associated with this video has been terminated."

13. There remains some confusion as to whether the account was suspended or terminated because Plaintiff received emails from YouTube and Google containing the following:

    14. From accounts-noreply@youtube.com (Apr. 8, 2019 at 19:13 EST): "We'd like to inform you that due to repeated or severe violations of our Community Guidelines

3

(https://www.youtube.com/t/community_guidelines) your YouTube account Junia Arise has been suspended. After review we determined that activity in your account violated our Community Guidelines, which prohibit spam, scams or commercially deceptive content (https://support.google.com/youtube/answer/2801973?hl=en). **Please be aware that you are prohibited from accessing, possessing or creating any other YouTube accounts.** For more information about account terminations and how our Community Guidelines are enforced, please visit our Help Center. If you would like to appeal the suspension, please submit this form."

15. From: no-reply@accounts.google.com (Apr. 8, 2019 at 20:06 EST) "Hi, The Google Account jordan@juniaarise2020.com is now disabled. It looks like it was being used in a way that violated Google's policies. We understand your account is important to you. So if you think this was a mistake, sign in to the disabled account and submit a request to restore it. You'll need to do this soon, because disabled accounts are eventually deleted, along with your emails, contacts, photos, and other data stored with Google. Learn more about Google policies. The Google Accounts team"

16. From youtube-disputes+2e1r5afdwo94j04@google.com (Apr. 9 at 10:19 EST): "Hello, We have received your account appeal and will get back to you as soon as possible. Sincerely, The YouTube Team"

17. From: youtube-disputes+2e1r5afdwo94j04@google.com (Apr. 9 at 11:25 EST) "Hello, Thank you for your account suspension appeal. We have decided to keep your account suspended based on our Community Guidelines and Terms of Service. Please visit http://www.youtube.com/t/community_guidelines for more information. Please do not respond to this email. Replies to this email will not be processed. Please refer to our Help Center for more information. Sincerely, The YouTube Team"

18. At the provided opportunity for appeal, Plaintiff reviewed YouTube's community guidelines, as instructed, then expressed in appeal a disappointment in the fact that YouTube failed to honor its own policy of a warning with no penalty for a first offense, followed by three strikes. In fact, this warning to three strikes policy applies to even the most extreme cases. For example: "instructions to kill or harm," "hard drug creation," "voter suppression," "sexualization of minors," and "content produced by violent criminal or terrorist organizations." Meanwhile, the Junia Arise trailer about female leadership was terminated without warning for a few comments with a link to its YouTube video and live Kickstarter campaign.

4

19. Plaintiff also expressed to YouTube that failure to rectify the breach would result in further damages to Plaintiff, and offered YouTube the opportunity to reconcile the matter within 48 hours, despite Plaintiff being in a time-sensitive 30 day fundraising campaign.

20. YouTube, however, denied Plaintiff's appeal and made no further contact with Plaintiff on the matter.

19. Plaintiff proceeded to delete the Twitter post containing the YouTube link to the Junia Arise film trailer, as required by the duty to mitigate damages, on April 9, 2019 at 10:19 EST (18 hours after the tweet was posted, 14 hours after the video was terminated, but merely seconds after Plaintiff became aware that the video and account had been terminated.)

20. Section 7 of YouTube's Terms of Service "Account Termination Policy" provides only two rationales for termination: "the user is determined to be a repeat infringer; or, for Terms of Service violations, "such as, but not limited to, pornography, obscenity, or excessive length." The reasoning provided by YouTube for termination is under "spam," and presumptively thereunder, "repetitive comments." However, these comments were made in a single brief window of time (an hour or so, and done manually), such that Plaintiff could not reasonably be considered a repeat infringer of repetitive comments, because common sense requires one to repeatedly post such repetitive comments, which is contrary to the facts of this case.

21. Furthermore, there is no guidance as to what constitutes a "severe violation" as prefaced in the notification email sent by YouTube. Although, dictionary.com defines severe as "unnecessarily extreme." Considering also that synonyms of repetitive are 'ceaseless' and 'continual,' a severe instance of repetitive comments could be interpreted as an unnecessarily extreme instance of ceaseless and continual comments, which is far from the instant case.

22. The more alarming element of this case is that after notifying YouTube of their responsibility to mitigate damages to Plaintiff in the appeal, Plaintiff recognized a change in the YouTube Community Guidelines when beginning to prepare this claim some weeks later. Plaintiff was instantly shocked to find the following new language towards the top of the webpage:

> 23. "Here are some common-sense rules that'll help you steer clear of trouble. Please take these rules seriously and take them to heart. Don't try to look for loopholes or try to lawyer your way around the guidelines—just understand them and try to respect the spirit in which they were created."

> 24. There also, at the bottom of the community guidelines webpage: "If a YouTube creator's on- and/or off-platform behavior harms our users, community, employees or ecosystem, we may respond based on a number of factors including, but not limited to, the egregiousness of their actions and whether a pattern of harmful behavior exists. Our response will range from suspending a creator's privileges to account termination."

25. This new language, if considered to be a part of the original agreement at the time of contracting would lessen Plaintiff's ability to seek a remedy because it would be considered notice in advance of the action taken by YouTube.

26. Thereafter, Plaintiff sought to learn whether YouTube might attempt to unlawfully invoke these statements as part of the Agreement between Plaintiff and Defendant at the time of contracting, or was simply trying to provide clarity to future users of the service and current users of the service newly bound by this updated version of Community Guidelines from this point forward.

27. After searching for the archived version of this page (https://www.youtube.com/yt/about/policies/#community-guidelines) as it was available on April 8th, 2019 on archive.org, Plaintiff was shocked to see that this language appeared to be present there also, at the time of contracting. Plaintiff noticed that this webpage held snapshots of this site that dated back to

2017. It was only when Plaintiff searched for archives of the link to Community Guidelines as cited in the termination email (http://www.youtube.com/t/community_guidelines) sent to Plaintiff by YouTube/Google that Plaintiff recorded very compelling mischief.

28. Using the Quicktime screen recording feature, Plaintiff captured video evidence of YouTube's attempt to change historical record upon the threat of litigation in attempt to absolve itself of liability. Plaintiff also opines that YouTube falsified records in efforts to further this deception by creating a Reddit forum within the YouTube Reddit channel, run by Google employees, that depicts this change in Community Guidelines as longstanding, in the form of a forum discussion between multiple users about the changes. However, this forum is administrated by Google employees, and there are inconsistent details which further indicate the actual fraud.

29. First, the dating of comments is irregular, such that messages purportedly from February, were written 'a month ago' as of April 26, which indicates an accuracy shortcoming in Defendants' attempt to manipulate historical record, moreover, the archived snapshot from March 1, 2019 displays a user interface that post-dates the user interface of the March 13, 2019 archive snapshot. In addition, the archive from March 13, 2019 shows code timestamped as "+1 month 13 days" from the archive date as seen and recorded by Plaintiff on April 28, 2019, which is evidence that this record did not exist on March 13, 2019 but was actually manufactured by Defendants on April 26, 2019 in furtherance of actual fraud.

30. YouTube is by far the largest platform in the world for video content distribution. However, Defendants' status as interactive computer networking services inhibit them from discriminatory act liability that otherwise covers common carriers. While Facebook and Twitter have platforms that distribute content to large numbers of viewers also, users have to pay for ad

placements to get their content out there, in contrast, YouTube users are paid for ad placements on their content, and stand uniquely in Monopoly status over this particular market, followed, at an incredible distance, by platforms such as Vimeo and DailyMotion.

31. Effectively, there is no other option for a user subject to discriminatory practices, as alleged here, to achieve anywhere near the same level of meaningful reach as one might on YouTube.

32. YouTube has long established trust with a global community, such that political discourse takes place there, the world's largest film production companies use YouTube to share their movie trailers, record labels promote and share music videos, and so many businesses share so much more. Defendants' arbitrary denial of access to YouTube by Plaintiff, prevented plaintiff from sharing culturally significant and highly time-sensitive content with the world because there remains no realistic competitive alternative to YouTube.

33. Plaintiff segues the motive behind the above actions through an unlawful monopoly leveraging theory under the Sherman Antitrust Act, 15 U.S.C. § 2.

34. Plaintiff is also the Founder and CEO of Pricecheck Inc., a Delaware corporation.

35. Pricecheck is a mobile payments application that allows shoppers to enter stores, scan items, and checkout right on their phones (see, pricecheckpay.com.)

36. Pricecheck has encountered fierce competition since founding in March of 2016. For instance, Google launched Tez in India, now rebranded as Google Pay, in August 2017, which is a Pricecheck competitor in the mobile self checkout market.

37. During development, Plaintiff utilized Google Vision in the Pricecheck app to add computer-vision technology to scan product barcodes with users' cell phone cameras.

39. Plaintiff filed a provisional patent for mobile-self-checkout technology in July 2017.

38. Google Director of Artificial Intelligence, Scott Penberthy and Plaintiff became acquainted after a FinTech conference at Fordham University in New York, later that Fall (2017). Whereby Plaintiff sought advice from Mr. Penberthy regarding an element of computer vision technology that would use existing retail surveillance camera networks to help prevent inventory loss for merchant customers who choose to use Pricecheck in their stores.

39. Mr. Penberthy connected Plaintiff with a small team of three google employees to discuss how Plaintiff can incorporate Google's TensorFlow as a machine learning tool to better process a computer vision technique know as human-object-interaction.

40. Plaintiff however suddenly failed to raise capital to keep the project running, and was unable to afford the costs of patent filing in July 2018, thus Plaintiff resubmitted a second provisional patent application which again expires one year later, July 2019.

41. Plaintiff has agreed to complete the Junia Arise film for 20% of the kickstarter campaign raise as a last chance effort to secure funds needed to personally finance the patent filing this July, despite approximately $20,000 being very little for 12-months of part-time work.

42. The mobile payments market however, is projected to be worth $2.73 trillion by 2023. Defendant's leveraged their monopoly power in the video content distribution market in an attempt to also gain monopoly power in the global mobile payments market.

43. Plaintiff's personal email account happens to be hosted by Google, and Plaintiff's business email is also hosted by Google, using G-Suite for business.

44. Defendants at very least have access to Plaintiff's personal email accounts, and trade secrets held in Plaintiff's business email account with G-Suite, such that Defendants are at least enabled to understand Plaintiff's plans to secure capital, and interfere and disrupt them in order

to prevent a status quo where Google Pay must pay Plaintiff licensing fees, or oblige a court ordered injunction to continue participating in the mobile-self-checkout market.

### III. RELIEF

45. Plaintiff seeks relief from detriment to loss suffered in property by terminating the Junia Arise video, in breach of contract, from view of prospective campaign backers on the largest and only, mature and meaningful option for large scale video content distribution, under Ca. CIV. Code § 3274, Ca. CIV. Code § 3275, Ca. CIV. Code § 3282, and Ca. CIV. Code § 3283. Defendant YouTube had a duty to honor the termination clause of its Terms of Service, YouTube breached that duty by discriminatorily terminating the Junia Arise trailer in the midst of a fundraising campaign, and Plaintiff suffered certain loss as a result.

46. Plaintiff seeks relief from fraud and deceit by YouTube under Ca. CIV. Code § 1709 and 1710 because YouTube appears to have tried to deceive Plaintiff into believing its termination policy was more far reaching than at the time of contracting by allegedly changing that policy in historical context to mislead Plaintiff about the strengths of this breach of contract claim, and perhaps in an attempt to evade justice by preparing falsified records for the event of trial.

47. Plaintiff further seeks relief from YouTube under federal wire fraud stature 18 U.S.C. § 1343. If applicable, 18 U.S.C. § 1512 for the intent to impair archives of their Terms of Service and Community Guidelines by corruptly compromising these materials using technical means to alter their integrity for later use in an official proceeding. Plaintiff also seeks relief under 18 U.S.C. § 1349; and for tortious interference, breach of the duty of good faith and fair dealing, and for loss of chance (considering the Junia Arise fundraising campaign is ultimately unsuccessful.)

48.     Finally, Plaintiff seeks relief from the monopoly power of Alphabet, Google, and YouTube jointly and severally over the user submitted online video platform market under 15 U.S.C. § 2. Defendants have possession of monopoly power in the stated market, have shown willful acquisition and maintenance of that power in and exclusionary manner, and Plaintiff has suffered a causal antitrust injury as a result because Defendants' monopoly over video content distribution, illegal action therein, as an attempt to gain a monopoly over the $2.73 trillion dollar mobile payments market is a showing of monopoly leveraging its power to gain another monopoly.

49.     The alleged conduct by Defendant's is so egregious and so damaging to society writ large, that the compensatory and punitive damages must align with what is necessary to punish the Defendant's for their sinister culpability in breaking the trust the world has given them by attempting to change historical facts to steal opportunity from others, and the resulting attempt to further oppress the women who have been praying day after day, hour after hour, for this film project to be successful.

50.     God only knows how often Defendants have used artifice to have their will be done but this claim will stand to deter Defendants and similarly situated technology companies that society has entrusted as record keepers, to stop this destructive behavior immediately.

51.     In the interest of justice, Plaintiff seeks a preliminary injunction to have the Junia Arise film trailer restored to YouTube, and continue service to the Junia Arise account without prejudice.

52. Finally, Plaintiff seeks a remedy of $109.1 billion for compensatory and punitive damages for losses in the $2.73 trillion mobile payments market, for harm to reputation, and punishment for trying to deceive the world about the facts of this case, plus all costs of litigation by this Plaintiff, and all other parties that the laws of joinder may require.

## IV. Certification and Closing

*Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.*

*I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.*

Respectfully submitted,

/s/ Jordan Powell

Jordan Powell
6441 Meadowlark Drive
Dunkirk, MD 20754
email: jordan.ttpowell@gmail.com
Phone: (202) 503-5284
Fax: N/A

Dated: April 29, 2019